**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

RAYMOND E. CLARK, and
BETTYJUNE CLARK,

      Plaintiffs,

v.

HYATT HOTELS CORPORATION,
HYATT PLACE FRANCHISING, LLC,
NOBLE INVESTMENT GROUP, LLC,
NF II BOULDER OP CO, LLC,
HP BOULDER LLC, and
INTERSTATE HOTELS & RESORTS, INC.,

      Defendants.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

---

Between (at least) November 10, 2018 and November 18, 2018, a faulty boiler and ventilation system spewed toxic carbon monoxide ("CO") gas throughout the Hyatt Place Boulder / Pearl Street Hotel, poisoning hundreds of unknowing guests. CO is a colorless, odorless, and potentially deadly gas. Hotel guests including Raymond E. "Ray" Clark and Bettyjune "Juni" Clark were seriously injured as a result.

Plaintiffs Ray and Juni Clark bring this Class Action Complaint and Demand for Jury Trial against Defendants Hyatt Hotels Corporation; Hyatt Place Franchising, LLC; Noble Investment Group, LLC; NF II Boulder Op Co, LLC; HP Boulder LLC; and Interstate Hotels & Resorts, Inc. (all Defendants together d/b/a "Hyatt Place Boulder / Pearl Street") for the harm they caused to

Plaintiffs and members of the putative Class by exposing them to CO. Plaintiffs allege as follows based upon personal knowledge as to their own acts and experiences, and as to all other matters, based upon information and belief.

## NATURE OF THE ACTION

1. Plaintiffs and the other hotel guests between November 10–18, 2018—*i.e.*, members of the putative class—put their trust in Defendants when they stayed at the Hyatt Place Boulder / Pearl Street Hotel located at 2280 Junction Place, Boulder, Colorado, 80301 (hereinafter the "Hotel"). But Defendants failed to provide their guests with appropriate safety measures during their stays, and then failed to inform them of the dangers to which they were exposed.

2. Specifically, between (at least) November 10, 2018 and November 18, 2018, a faulty boiler and ventilation system at the Hotel produced and then transported high levels of CO into the Hotel guest rooms and common areas.

3. During this period, CO funneled out of the boiler room through exhaust / vent pipes.  The CO was pulled back into the building in numerous locations, including through the external vent / air intake of room number 328 (and likely numerous other guest rooms in the same fashion), poisoning Plaintiffs Ray and Bettyjune Clark (collectively, the "Clarks").

4. The Clarks stayed at the Hotel in room number 328 from November 10 to November 18, along with other putative class members across the 150 rooms of the Hotel.

5. The Clarks began feeling sick after their first night in the Hotel, and the symptoms progressed and intensified throughout their stay. However, the Hotel never gave any warning of the possible cause, and no CO alarm sounded at any point during the week.

After extreme bouts of nausea, disorientation, vomiting, passing out, and four trips to the emergency department of the Foothills Hospital, the Clarks finally discovered that CO poisoning was responsible for their illness.

6.  The Clarks survived their stay at the Hotel, but suffered serious CO poisoning, permanent cognitive injuries, and physical impairment as a result.

7.  The Hotel and the Defendants did nothing to protect or warn the Clarks or other guests of the CO causing them serious harm at the time.

8.  Accordingly, the Clarks bring this action on their own behalf and on behalf of a putative class of similarly situated individuals defined below, seeking damages and injunctive relief (including medical monitoring) under Colorado law.

## PARTIES

**The Clarks**

9.  Plaintiff Raymond E. "Ray" Clark is a Montana citizen.

10. Plaintiff Bettyjune "Juni" Clark is a Montana citizen.

11. Ray and Juni are, and at all relevant times were, lawfully married as husband and wife.

**Hyatt Hotels Corporation**

12. Defendant Hyatt Hotels Corporation (hereinafter "Hyatt") is a Delaware corporation whose principal place of business is in Chicago, Illinois.

13. Hyatt is a multinational hospitality company that owns, manages, and franchises luxury hotels, resorts, and vacation properties, collectively comprising the "Hyatt Hotels group."

14. The Hyatt Hotels group encompasses numerous hotel brands (19 in total) and more than 850 properties.

15.     The Hyatt Hotels group uses a unified loyalty rewards system known as the "World of Hyatt."

16.     Hyatt operates its hotels under three models: franchise, management, and ownership.

17.     Creating a uniform experience across the Hyatt Hotels group enhances Hyatt's profits.

18.     In pursuit of this goal, Hyatt retains and exercises a pervasive right of control over many aspects of its branded hotels — regardless of whether a particular location is company-owned, managed, or franchised.

19.     Hyatt's tools of control include, but are not limited to:

    a.      its franchise agreements;

    b.      its building specifications;

    c.      system standards regulating virtually every aspect of hotel operation;

    d.      management, personnel, and operational training programs; and

    e.      scheduled and unannounced inspections and audits by Hyatt representatives.

20.     Hyatt also strives to conceal from its guests whether they are patronizing a company-owned location, a company managed location, or a franchised location.

21.     Hyatt is aware that many of its patrons trust the Hyatt brand, and know this trust would be eroded if its patrons were aware that a particular facility was owned and operated by a separate company.

22.     Hyatt cultivates the appearance of common ownership across the Hyatt Hotels group by measures including but not limited to:

    a.      extensively displaying its branded names and marks on signage, uniforms, business cards, carpets, towels, and other physical items;

      b.        prohibiting franchisees and operators from displaying their own names and marks;

      c.        failing to differentiate Hyatt owned and operated locations from managed and franchised locations on its website and internet reservation system; and

      d.        maintaining a common system of rewards membership and points across the Hyatt Hotels group.

23.      On information and belief, as of November 2018, Hyatt owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**Hyatt Place Franchising, LLC**

24.      Defendant Hyatt Place Franchising, LLC (hereinafter "Hyatt Franchising") is a Delaware limited liability company whose principal place of business is in Chicago, Illinois.

25.      On information and belief, as of November 2018, Hyatt Franchising owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**Noble Investment Group, LLC**

26.      Noble Investment Group, LLC (hereinafter "Noble") is a Georgia limited liability company whose principal place of business is in Georgia.

27.      On information and belief, as of November 2018, Noble owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**NF II Boulder Op Co, LLC**

28.      NF Boulder Op Co, LLC (hereinafter "NF") is a Delaware Limited Liability Company whose principal place of business is in Georgia.

29.      On information and belief, NF is a subsidiary of Noble, and as of November 2018 owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**HP Boulder, LLC**

30.     HP Boulder, LLC (hereinafter "HP") is a Delaware limited liability company whose principal place of business is in Georgia.

31.     On information and belief, HP is a subsidiary of Noble, and as of November 2018, owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**Interstate Hotels & Resorts, Inc.**

32.     Interstate Hotels & Resorts, Inc., (hereinafter "Interstate") is a Delaware corporation whose principal place of business is in Virginia.

33.     On information and belief, Interstate as of November 2018, owned, operated, or controlled, directly or through its subsidiaries, the Hotel.

**The Relationship Between Defendants**

34.     As legal entities, Defendants can act only through their officers, directors, members, managers, employees, and agents.

35.     Defendants are vicariously liable for the conduct of those acting on their behalf within the scope of their duties.

36.     On information and belief, Hyatt (and/or Hyatt Franchising) and Noble (and/or NF or HP) entered into a Franchise Agreement.

37.     On information and belief, Noble was required to obtain Hyatt's approval for its selection and employment of a property manager.

38.     On information and belief, Noble (and/or NF or HP) entered into a Management Agreement with Interstate.

39.     On information and belief, Defendants shared profits and losses.

40.     On information and belief, the Franchise Agreement gave Hyatt (and/or Hyatt Franchising) a pervasive right to control many aspects of Noble's (and/or NF or HP's) and Interstate's business regarding the Hotel.

41.     On information and belief, Hyatt (and/or Hyatt Franchising) required Noble (and/or NF or HP) and Interstate to follow a detailed set of operating procedures that regulated many aspects of Noble's business.

42.     On information and belief, Hyatt (and/or Hyatt Franchising) reserved the right to conduct both scheduled and unannounced inspections and audits of the Hotel to determine whether the facility was up to Hyatt standards, and to require Noble (and/or NF or HP) and Interstate to perform repairs and maintenance according to Hyatt's orders.

43.     On information and belief, Hyatt (and/or Hyatt Franchising) did in fact inspect the Hotel on a regular basis.

44.     On information and belief, Hyatt (and/or Hyatt Franchising) had control over whether the boilers in the Hotel were properly serviced.

45.     On information and belief, Hyatt (and/or Hyatt Franchising) had control over the design of the Hotel, including the boilers, boiler exhaust vents / vent pipes, and the external vent / air intake of individual rooms.

46.     On information and belief, Hyatt (and/or Hyatt Franchising) had control over whether functional CO alarms were installed in the boiler room and individual guest rooms.

47.     Defendants did nothing to inform Hotel guests of the agreement between Hyatt (and/or Hyatt Franchising) and Noble (and/or NF or HP Boulder); or the agreement between Noble (and/or NF or HP) and/or Interstate.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) because:

    a.     At least one defendant is diverse from at least one plaintiff.  The Clarks are Montana citizens.  None of the incorporated defendants are incorporated or have their principal place of business in Montana.  Moreover, under 28 U.S.C. § 1332(d)(10), for purposes of the Subsection (d) the citizenship of an unincorporated association such as an LLC is its state or organization or principal place of business.   On information and belief, none of the LLC defendants were organized or have their principal place of business in Montana.

    b.     The putative class has 40 or more members.

    c.     The amount in controversy exceeds $5 million.  Even if only a few guests suffered permanent cognitive impairments, their aggregated damages will easily exceed the jurisdictional minimum for Subsection (d).

49.     This Court has personal jurisdiction over the Defendants pursuant to C.R.S. § 13-1-124 and other applicable law because this action arises from Defendants transacting business in Colorado; committing torts in Colorado; and owning, using, and possessing real property in Colorado.  Moreover, the exercise of personal jurisdiction in this case is consistent with the Due Process Clause of the Fifth Amendment to the United States Constitution.

50.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## COMMON FACTUAL ALLEGATIONS

**The Threat of Carbon Monoxide Poisoning**

51.     CO is a colorless, odorless, potentially deadly gas.

52.     Gas-fired appliances generate CO as a by-product of combustion.  Poorly maintained and/or poorly ventilated gas-fired appliances create a dramatically higher risk of dangerous levels of CO and a risk to human life.

53.     Due to the potential risk of CO poisoning, it is essential to install a CO alarm whenever a gas-fired appliance is operated in an enclosed space where people may be present.

54.     It is also essential to regularly and properly maintain gas-fired appliances to ensure that they do not produce deadly levels of CO. Likewise, it is vital to regularly and properly test CO alarms to ensure that they are functioning properly.

55.     When breathed in, CO enters the bloodstream and triggers a damaging sequence of physiological changes. It deprives the body tissues—including the brain—of oxygen, and causes cytotoxic and inflammatory processes, causing cellular death. These harmful processes can progress long after the victim is removed from the toxic environment.

56.     Initially, CO poisoning mimics common ailments such as food poisoning, a headache, or the flu. The gas also intoxicates victims, inhibiting their ability to think clearly or recognize symptoms.

57.     Carbon monoxide poisoning can result in permanent — though sometimes subtle — brain injury.  In some cases, adverse sequelae following CO poisoning do not manifest for weeks, or even months, following the exposure.

58.  Commonly reported symptoms of patients with sequelae following CO poisoning include headaches, dizziness, imbalance, sleep disturbances, cognitive impairments, affective problems, and other neurological sequelae.  As CO poisoning victims age, they are at increased risk for early cognitive decline and dementia.

59.  Early detection and treatment are medically necessary and/or beneficial for the myriad cognitive, affective, neurological, and somatic effects associated with carbon monoxide poisoning.

60.  The danger of CO poisoning and the means of minimizing that danger are common knowledge in the hotel industry.

61.  Before the Clarks and other guests at the Hotel were poisoned, Defendants actually knew or should have known of the danger of CO poisoning and the means of minimizing that danger.

62.  Preventive maintenance and CO alarms are relatively inexpensive, particularly when compared to the risk of serious injury or death resulting from CO poisoning.

63.  Defendants owned, operated and/or managed the Hotel with 150 guest rooms with a capacity of several hundred.  As owners/operators/managers of the Hotel, the Defendants were responsible for the safety of their guests to prevent the guests from being poisoned or otherwise seriously injured or killed.

64.  Around the time of the events described herein, the Hotel was at or near its capacity due to a University of Colorado football game.  The Defendants were responsible for the safety of hundreds of their guests.

**Defendants' Disregard for Guests' Safety**

65.    On or about November of 2018, the Hotel had a boiler room located on the first floor of the Hotel.

66.    The boiler room contained four boilers: two large boilers to heat the Hotel and two smaller boilers to provide domestic hot water.

67.    The Colorado Division of Oil and Public Safety inspected all four boilers on April 7, 2017.

68.    The documentation of the 2017 inspections included a reminder for the Hotel to check the boilers' emergency power off functions, combustion air intakes, and the pressure and temperature controls.

69.    There is no indication that the boilers were checked for operational functionality after the 2017 inspections and before November 2018.

70.    Defendants failed to reasonably maintain the boilers.

71.    In 2014, the City of Boulder adopted the 2012 International Fire Code. The 2012 International Fire Code (§ 1103.9) requires hotels to install CO alarms in certain areas. This requirement applies to both new construction and existing buildings.

72.    As of November 2018, there were no CO alarms in the boiler room or the individual guest rooms at the Hotel.

73.    Under these dangerous circumstances, in November 2018, the boilers at the Hotel were spewing high levels of CO out of the vent pipes. This toxic exhaust gas was then pulled back into the building in numerous locations, endangering all the guests and others inside the Hotel.

**The Poisoning**

74.     The Clarks checked into room number 328 at the Hotel on November 10, 2018, and they stayed at the Hotel until November 18, 2018.

75.     On the morning of November 11, Mr. and Mrs. Clark noticed that they felt weak and strangely short of breath while working out in the Hotel's fitness center.

76.     The Clarks woke up on November 12 with pounding headaches, and Mr. Clark noticed that he felt confused and disoriented. Later that day he had uncharacteristic difficulty navigating the city, becoming lost while driving back to the Hotel from his daughter's house.

77.     The morning of November 13, Mrs. Clark left room number 328 for the fitness center, leaving Mr. Clark asleep.  Shortly thereafter, a Hotel employee awoke Mr. Clark to inform him that Mrs. Clark had passed out in the lobby. Mr. Clark took her to the Boulder Community Health Foothills emergency department, but two hours of examinations yielded no explanation for Mrs. Clark's illness. After returning to the Hotel, Mrs. Clark began to feel nauseous and spent the rest of the day vomiting.

78.     The Defendants did nothing to investigate or otherwise warn the Clarks or other guests of an imminent risk of CO poisoning at the Hotel.

79.     Mr. Clark awoke early on November 14 with a splitting headache and left room number 328. When he returned, Mrs. Clark abruptly woke up, passed out, and began vomiting while unconscious. After Mrs. Clark regained consciousness, they returned to the ER for another evaluation.  They were discharged and returned to the Hotel.

80.   For the next three days, the Clarks continued to suffer from headaches, nausea, and general malaise. They noticed that their symptoms worsened after spending time in the Hotel.

81.   On November 18, the Clarks again awoke feeling ill, disoriented, and light-headed, and Mrs. Clark had developed a flashing in one of her eyes.

82.   On a hunch, they bought a CO alarm, Kidde model KN-COB-DP2, from the neighborhood Home Depot. This alarm is designed and UL certified to alarm in 4–15 minutes when CO levels of over 400 ppm are present. It began to alarm immediately after being plugged into a socket in room number 328, signaling high levels of CO.

83.   The Clarks went to the Hotel lobby with the alarm to speak to the general manager. All the while, the Clark's personal CO alarm continued to sound.

84.   The Clarks informed the Hotel's general manager, Michelle Ward, that their alarm was registering dangerously high levels of CO.  Ms. Ward dismissed their concerns, explaining that the Hotel had recently had a safety inspection.

85.   The maintenance supervisor was also present when the Clarks spoke with Ms. Ward. He told the Clarks that it was the hot water system and not to worry about it.

86.   The maintenance supervisor also incorrectly told the Clarks that all the Hotel's rooms had combination smoke/CO alarms.

87.   The only thing the Hotel did in response to the Clarks report of CO was to move them to room number 327, directly across the hallway from their original room.

88.   Even in the face of the Clark's specific warnings, the Defendants did nothing to investigate or otherwise warn the Clarks or other guests of an imminent risk of CO poisoning at the Hotel.

89.     The Clarks called their family doctor for another opinion. The physician urged them to return to the emergency department.

90.     Testing at the hospital showed that both Mr. and Mrs. Clark had dangerously high carboxyhemoglobin ("COHb") levels, confirming CO poisoning.  Mrs. Clark's COHb level was 20.4% and Mr. Clark's was 22%.

91.     A physician in the emergency department then alerted the Boulder Fire Department of the Clarks' CO poisoning.

92.     The Boulder Fire Department responded to the Hotel minutes thereafter.

93.     The Boulder Fire Department evacuated the Hotel, and the firefighters spent three hours ventilating the building.

94.     During the evacuation, the Hotel's maintenance supervisor erroneously told firefighters that there were no gas lines coming into the Hotel.

95.     While on scene, the fire department recorded CO concentrations as high as 500 ppm in the boiler room, and CO concentrations from 200–350 ppm in various rooms on the second through fifth floors floors. The fire department contacted Xcel Energy, the natural gas provider for the Hotel.

96.     An Xcel Energy representative arrived and "red-tagged" one of the boilers, meaning that the equipment was not to be operated until inspected by a certified repairperson.

97.     Firefighter and Incident Commander Mark Johnson advised the Hotel's general manager to contact all guests who had been in the Hotel in the last three days to inform them that they may have been exposed to dangerous levels of CO, and that they should be checked out by a doctor because of the "possible lingering effects of carbon monoxide."

98.     On information and belief, neither the general manager of the Hotel, nor anyone else working for Defendants, ever contacted guests to advise them of their potential exposure to CO and the need to seek medical attention.

99.     The Hotel affirmatively misled guests by telling them that there was a "false alarm."

**The Aftermath**

100.    As a result of being poisoned, the Clarks—and presumably numerous other guests staying at the Hotel that week—have suffered severe cognitive, emotional, and physical injuries and impairments including but not limited to:

   a.     Cognitive deficits including but not limited to difficulties with math, memory, processing speed, reading, and word-finding;

   b.     Emotional difficulties including depression, anxiety, and frustration at the inability to do everyday tasks;

   c.     Visual disturbances;

   d.     Fatigue and exhaustion;

   e.     Sleep disturbances;

   f.     Pain; and

   g.     Other physical injuries.

101.    As a result of their injuries, the Clarks have suffered, and will continue to suffer, damages including but not limited to:

   a.     Past and future medical and other care expenses;

   b.     Physical, mental, and emotional pain and suffering;

   c.     Inconvenience;

d.      Permanent physical impairment, including brain injuries;

e.      Loss of enjoyment of life; and

f.      Loss of consortium.

102.    As a result of their CO poisoning injuries, the Clarks require and would benefit from the following reasonably medically necessary medical procedures ("Baseline Assessment Program"):

a.      Physical Medicine & Rehabilitation clinical examination and evaluation;

b.      Neuropsychological examination and evaluation;

c.      Neuroradiological imaging and other diagnostic testing / evaluation; and

d.      Other evaluation and treatment by medical specialists, as recommended after evaluation and consult by physical medicine & rehabilitation, neuropsychology, and neuroradiological providers.

## CLASS ALLEGATIONS

103.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action and seek certification of the claims and issues in this action on behalf of a Class defined as follows:

All individuals who were guests at the Hyatt Place Boulder/Pearl Street between November 10, 2018 and November 18, 2018.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who

properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

104.   **Numerosity**: On information and belief, the class will likely be several hundred individuals.  The exact number of class members is unknown to Plaintiffs at this time, but on information and belief the hotel's 150 rooms were exposed to CO over a period of more than 8–9 days and nights.  It is clear that individual joinder is impracticable. Ultimately, the Class is ascertainable because the members will be easily identified through Defendants' records.

105.   **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to, the following:

a.      whether Defendants permitted or allowed Plaintiffs and the Class to be exposed to CO at the Hotel;

b.      whether Defendants failed to maintain proper safety measures at the Hotel regarding its boiler and HVAC system;

c.      whether Defendants' conduct constitutes a violation of the Colorado Premises Liability Act;

d.      whether Defendants' conduct constitutes a violation of the Colorado Consumer Protection Act;

e.      whether Defendants' conduct was negligent; and

f.      whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

106.   **Typicality**: Plaintiffs' claims are typical of the claims of all the other members of the Class, in that Plaintiffs and the members of the Class sustained physical and emotional damages as a result of Defendants' uniform wrongful conduct.

107.   **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

108.   **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable.

### FIRST CAUSE OF ACTION

### Violation of the Colorado Premises Liability Act

### (On Behalf of Plaintiffs and the Putative Class)

109.   At all relevant times Hyatt was a "landowner" for the purposes of § 13-21-115, C.R.S., the Premises Liability Act, hereinafter the PLA.

110.   At all relevant times Hyatt Franchising was a "landowner" for purposes of the PLA.

111.   At all relevant times Noble was a "landowner" for purposes of the PLA.

112.   At all relevant times NF was a "landowner" for purposes of the PLA.

113.   At all relevant times HP was a "landowner" for purposes of the PLA.

114.   At all relevant times Interstate was a "landowner" for purposes of the PLA.

115.   At the time they were poisoned, the Clarks, and all other class members, were "invitees" for the purposes of the PLA.

116.   Defendants owed the Clarks and other class members a duty to exercise reasonable care to protect them against dangers of which Defendants actually knew or should have known.

117.   Defendants' duty was non-delegable; *i.e.*, Defendants are not relieved from liability even if they hired independent contractors to discharge their duties. *See Larrieu v. Best Buy Stores, L.P.*, 2013 CO 38, ¶ 15, 303 P.3d 558, 561; *Springer v. City & Cty. of Denver*, 13 P.3d 794, 804 (Colo. 2000).

118.   Defendants failed to comply with this duty through acts and omissions including, but not limited to:

   a.     failure to properly maintain the Hotel boilers;

   b.     failure to properly inspect and maintain the flue pipe(s), exhaust ventilation, and combustion air intakes associated with the boilers;

   c.     failure to install CO alarms in the boiler room and elsewhere in the Hotel;

   d.     failure to install CO alarms in individual guest rooms at the Hotel;

   e.     failure to install CO alarms in locations where alarms would be audible to guests;

   f.     failure to link local CO alarms to a centralized alarm;

   g.     failure to test CO alarms at appropriate intervals;

   h.     failure to replace batteries in CO alarms;

i.      failure to repair or replace defective CO alarms;

j.      failure to warn the Clarks about the improperly maintained boiler(s) and/or missing or defective CO alarms;

k.      affirmatively formulating, mandating, and implementing unsafe policies and procedures for equipment and alarm installation, inspection, maintenance, and/or repair and

l.      affirmatively concealing and/or failing to warn guests of a known and active presence of CO at the Hotel.

119.   Defendants' culpable acts and omissions directly and proximately caused the Clarks' and other class members' injuries and damages.

120.   Plaintiffs seek all damages allowed under the law, including attorney's fees and prejudgment interest related to their claims.

## SECOND CAUSE OF ACTION

## Negligence & Vicarious Liability

## (On Behalf of Plaintiffs and the Putative Class)

121.   In the alternative to the First Cause of Action, if for any reason an action under the PLA should fail, Defendants are liable for negligence.

122.   Defendants had a duty to avoid affirmatively causing harm to the Clarks.

123.   In addition, as innkeepers, Defendants had a special relationship with the Clarks. *See Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 32, 347 P.3d 606, 613.

124.   This special relationship gave rise to a duty to exercise reasonable care to prevent harm to the Clarks.  *See id.*

125.    Defendants breached their duties of care through the acts and omissions described above.

126.    In the alternative, if Hyatt (and/or Hyatt Franchising) did not directly breach a duty of care, then Noble (and/or NF or HP) and/or Interstate were Hyatt's (and/or Hyatt Franchising's) actual agents and Hyatt (and/or Hyatt Franchising) is therefore vicariously liable for Noble's (and/or NF or HP's) and Interstate's culpable acts and omissions.

127.    In the alternative, if Noble (and/or NF or HP Boulder) did not directly breach a duty of care, then Interstate was Noble's (and/or NF or HP Boulder's) actual agent and Noble (and/or NF or HP Boulder) is therefore vicariously liable for Interstate's culpable acts and omissions.

128.    In the alternative, Interstate, Noble, NF, HP, Hyatt, and Hyatt Franchising were partners in that they carried on as co-owners of a business for profit, and they are therefore jointly and severally liable for each other's culpable conduct.

129.    Plaintiffs seek all damages allowed under the law, including attorney's fees and prejudgment interest related to their claims.

### THIRD CAUSE OF ACTION

### Violation of the Colorado Consumer Protection Act

### (On Behalf of Plaintiffs and the Putative Class)

130.    Defendants are "persons" as defined by C.R.S. § 6-1-102(6).

131.    Plaintiffs placed reasonable trust in Defendants as innkeepers.

132.    The Clarks and other Class members were actual consumers of Defendants' services or property and were injured as a result of Defendants' deceptive trade practices.

133.   Defendants engaged in deceptive trade practices in the course of their businesses. Defendants' deceptive trade practices included:

   a.   representing that services or property were of a particular standard or quality when Defendants knew or should have known that the services or property were not of that standard or quality, in violation of C.R.S. § 6-1-105(1)(g);

   b.   failing to disclose material information concerning services or property which was known at the time of an advertisement or sale, with an intent to induce the Class to conduct a transaction with Defendants, in violation of C.R.S. § 6-1-105(1)(u);

   c.   representing, expressly on its website and by implication, that the Hotel was safe for persons, including individuals with disabilities, older individuals, and pets;

   d.   representing, expressly on the Hotel's website and by implication, that the Hotel was safe for sleeping, spending considerable time, relaxing, working, and exercising;

   e.   knowingly concealing from Hotel guests that they were exposed to dangerous levels of CO and may have been injured, even after explicit warnings by the fire department;

   f.   concealing from guests that the Defendants failed to maintain the Hotel's boilers;

   g.   concealing from guests that the Defendants failed to install and/or maintain CO alarms at the Hotel;

   h.   recklessly or knowingly concealing the material fact that the Defendants were not prepared to reasonably or adequately safeguard the Clarks' or the Class' health;

     i.      failing to implement and maintain reasonable health and safety measures to protect the Clarks and the Class, which was a direct and proximate cause of the CO exposure;

     j.      failing to check the operational functionality of the boilers after the 2017 inspections and before November 2018;

     k.      failing, in violation of the 2012 International Fire Code (§ 1103.9) to install CO alarms in required areas;

     l.      failing to install CO alarms in the boiler room at the Hotel; and

     m.      failing to install CO alarms in the individual guest rooms at the Hotel.

134.   Defendants' representations that their premises was safe were false; Defendants' failure to properly maintain their boilers and to install CO alarms rendered their premises unsafe.

135.   Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the safety and economic value of the Hotel.

136.   Plaintiffs reasonably relied on Defendants' representations and omissions.

137.   Defendants' deceptive trade practices have a significant public impact because:

     a.      upon information and belief, a large number of guests spent time in common areas or occupied rooms that the firefighters discovered had dangerous levels of CO;

     b.      consumers, compared to hotel owners and operators, are relatively unsophisticated when it comes to the dangers of CO poisoning and the appropriate methods of detecting CO; and

c.      if the Class members remain in the dark and uncompensated for their injuries, Defendants' deceptive trade practices have the significant potential of impacting future consumers.

138.    This is a matter of public concern and the state has a strong interest in protecting the health of hotel guests.

139.    The Defendants' misrepresentations and omissions caused the Clarks and the Class' injuries because the Clarks and the Class would not have patronized Defendants' Hotel if they were aware of the truth.

140.    The Clarks and the Class seek all monetary and nonmonetary relief allowed by the Colorado Consumer Protection Act.

141.    Plaintiffs seek all damages allowed under the law, including attorney's fees and prejudgment interest related to their claims.

### FOURTH CAUSE OF ACTION

### Medical Monitoring

### (On Behalf of Plaintiffs and the Putative Class)

142.    Plaintiffs suffered CO poisoning as a result of Defendants' negligent and otherwise unlawful conduct.

143.    As a proximate result of their CO poisoning, Plaintiffs have suffered serious severe cognitive, emotional, and physical injuries and impairments including but not limited to: cognitive deficits including but not limited to difficulties with math, memory, processing speed, reading, and word-finding; emotional difficulties including depression, anxiety and

frustration at the inability to do everyday tasks; visual disturbances; fatigue and exhaustion; sleep disturbances; pain; and other physical injuries.

144.   As proximate result of their CO poisoning, Plaintiffs are at risk of serious latent diseases, including dementia.

145.   Early detection and treatment are medically necessary and/or beneficial for the myriad cognitive, affective, neurological and somatic effects associated with carbon monoxide poisoning.

146.   Because of this increased risk, Plaintiffs require certain reasonably medically necessary and beneficial baseline medical procedures, or a "Baseline Assessment Program," consisting of the following:

a.      Physical Medicine & Rehabilitation clinical examination and evaluation;

b.      Neuropsychological examination and evaluation;

c.      Neuroradiological imaging and other diagnostic testing / evaluation; and

d.      Other evaluation and treatment by medical specialists, as recommended after evaluation and consult by physical medicine & rehabilitation, neuropsychology, and neuroradiological providers.

147.   The provision of a Baseline Assessment Program would increase the chances of early detection and treatment of diseases that Plaintiffs and the putative class members suffer from increased risk of due to Defendants' negligent and otherwise unlawful conduct.

148.   Consequently, Defendants should be required to establish a medical monitoring program that includes, among other things:

      a.      Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of putative class members for the purposes of providing Baseline Assessment Program Testing; and

      b.      Notifying all putative class members in writing that they may require medical monitoring.

149.    Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to CO poisoning. Without a Court-approved medical monitoring program, Plaintiffs will continue to face an unreasonable risk of injury and disability and remain undiagnosed.

150.    Plaintiffs seek all damages allowed under the law, including attorney's fees and prejudgment interest related to their claims.

### PRAYER FOR RELIEF

The Clarks and the Class respectfully request that this Court grant judgment as follows:

1.    Judgment for the Clarks and members of the putative Class and against Defendants for economic damages;

2.    Judgment for the Clarks and members of the putative Class and against Defendants for non-economic damages;

3.    Judgment for the Clarks and members of the putative Class and against Defendants for physical impairment;

4.    Judgment for the Clarks and members of the putative Class and against Defendants for costs, interest (specifically including pre-judgment interest pursuant to C.R.S. § 13-21-101(1)), attorney's fees, and such other and further relief as the Court deems just;

5.      Injunctive relief prohibiting Defendants from operating their Hotel in a manner likely to cause serious health risks to the Clarks and the Class;

6.      Injunctive relief requiring Defendants to notify, or take action permitting the Court to notify, class members of their likely exposure to dangerous levels of CO on Defendants' premises;

7.      Injunctive relief in the form of the Court-approved Medical Monitoring program described in the Fourth Cause of Action (Medical Monitoring); and

8.      Pursuant to § 13-21-102, C.R.S. the Clarks specifically reserve the right to amend this Complaint if the evidence obtained through discovery and investigation establishes a triable issue of exemplary damages.

### JURY DEMAND

Pursuant to F.R.C.P. 38, the Clarks request a jury trial on all issues.

DATED this 1st day of May, 2020.

s/ Tyson E. Logan
Tyson E. Logan
The Spence Law Firm, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
 (307) 733-7290
logan@spencelaywers.com
Attorney for Plaintiffs

Address of Plaintiffs:
Ray and Bettyjune Clark
P.O. Box 1450
Ennis, MT 59729